## Case No. 16,014.

### UNITED STATES v. PAYNE.

[4 Dill. 387.] [2]

Circuit Court, D. Kansas. 1877.

JURISDICTION OF PROBATE COURT — PROPERTY OF POTTAWATOMIE INDIANS—ACTION FOR MONEY HAD AND RECEIVED.

1. Without the assent of the general government, the probate courts of a state have no jurisdiction to administer upon the property or credits of Indians who were members of a tribe which maintains towards the United States its tribal relations.

2. The grant of administration on the estate of a member of the Pottawatomie tribe of Indians, by a probate court in Kansas, by virtue of the treaty of 1867 (15 Stat. 536, art. 8, of senate amendments), when such member is in fact alive, is void as respects the administrator, and money paid to him by the United States in that capacity may be recovered back.

This cause is submitted to the court upon the facts set forth in the petition, answer, and reply, which are severally admitted to be true. The petition states that, on June 10th, 1871, the defendant [Benjamin T. Payne] was indebted to the plaintiff in the sum of $6,111.84, for money before that time had and received by the defendant, to and for the use of the plaintiff. The answer states, "that, in January and May, 1871, the

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

defendant was duly appointed by the probate court for Wabaunsee county, Kansas, administrator of the following named deceased persons: In-kuh-da-o-ks, Go-she-was-kpa-zo-mah, etc. (naming several other Indians having like names), and as such duly qualified; that said several persons were Pottawatomie Indians, and were, at the times of their several deaths, members of the Pottawatomie Tribe or Nation of Indians, and each owned real estate in said county, and was entitled to receive from the government of the United States, under treaty stipulations, $661.18, amounting in all to $6,611.80; that said sum was duly paid by the United States to this defendant, as such administrator; that defendant has duly accounted to the said probate court, and paid out under its direction, of the said moneys received from the United States, the sum of $4,271.22, and holds the balance subject to the orders of jurisdiction of the said probate court; that defendant has never received any other moneys of the United States." The replication states that the said Indians mentioned in the answer were alive, and members of the said tribe, at the time the defendant was appointed as administrator. The senate amendment to article 8, of the treaty of 1867, with the Pottawatomie tribe of Indians, is as follows: "Where allottees, under the treaty of 1861, shall have died, or shall hereafter decease, such allottees shall be regarded, for the purpose of a careful and just settlement of their estates, as citizens of the United States, and of the state of Kansas; and it shall be competent for the proper courts to take charge of the settlement of their estates, under all the forms, and in accordance with the laws of the state, as in the case of other citizens, deceased," etc. 15 Stat. 536.

George R. Peck, U. S. Dist. Atty.
Martin & Case, for defendant.

DILLON, Circuit Judge. It is admitted that the several Indians for whose estates the defendant was appointed administrator by the local probate court, were, at the time of such appointment, in full life, and members of the Pottawatomie tribe of Indians, and that the money received by the defendant of the United States was due to them by the United States under treaty stipulations with the tribe.

Where Indians maintain the tribal relations, their property is not subject to the laws of the state, or their estates to be administered upon in the probate court of the state, unless by the assent of the general government. The Kansas Indians, 15 Wall. [82 U. S.] 737, 757, 759; Mackey v. Coxe, 18 How. [59 U. S.] 100; Mungosah v. Steinbrook [Case No. 9,-924]; Gray v. Coffman [Case No. 5,714].

It will be conceded, for the purposes of this case, that the senate amendment to article 8 of the treaty of 1867, gave the probate court the authority to appoint administrators and settle the estate of deceased allottees of the

tribe. But it gave the probate court no authority to appoint administrators of an Indian, unless he had been an allottee under the treaty, and was dead.

The weight of judicial opinion would seem to be in favor of the proposition, even if the Indians and their property were subject to the probate jurisdiction of the courts of Kansas, that the court had no jurisdiction, and could have none, to make an appointment of an administrator of a person who, at the time, was alive. Jochumsen v. Suffolk Sav. Bank, 3 Allen, 87; Griffith v. Frazier, 8 Cranch [12 U. S.] 9, 23; Fisk v. Norvel, 9 Tex. 13. Contra, by the court of appeals of New York, in Roderigas v. East River Sav. Inst. [63 N. Y. 460], 15 Am. Law Reg. (N. S.) April, 1876, p. 205, where the note in disapproval, by the late Judge Redfield, may be found. Much may be said on both sides of the general proposition last stated. Roderigas v. East River Sav. Inst., just cited, may, possibly, be distinguished on solid grounds from such a case as the one before us. It was there held that a payment by a debtor in good faith to an administrator was valid, and would protect the debtor against a second payment, although the supposed intestate was alive at the time, and the letters of administration were subsequently revoked for this reason. The debtor was innocent, and acted on the faith of the grant of administration of the proper court. It may be a different question when it arises between an innocent third party and the administrator himself, which is the present case. It is possible that the case in the court of appeals of New York may be sustained on this ground, but we need not express any opinion on this point. We place our judgment in the case at the bar on the ground that under the treaty the probate court had no jurisdiction to make an appointment of an administrator for Indians who were alive at the time, and that its decision that it had jurisdiction, evidenced by the grant of letters of administration, is not conclusive in favor of the administrator, who, perhaps, had himself appointed, and who, at all events, voluntarily assumed that character, and held himself out to the world as sustaining that relation.

As the government owed this money to these Indians; as the defendant had no right to receive it; as the payment to the defendant did not absolve the government from the liability or duty to pay the amount to the Indians entitled thereto; and as the defendant, if he did not, indeed, apply for, voluntarily accepted and undertook to act as administrator, and does not claim that he has paid the money to the Indians entitled, or that the latter have ever ratified or confirmed the receipt of the money or its disposition by him, our judgment is that the United States may maintain this action to recover back the amount unlawfully received by the defendant.

Judgment for the plaintiff.

## Case No. 16,015.

UNITED STATES v. PAYSON et al.

SAME v. SANCHEZ.

[1 Cal. Law J. 235.]

District Court, N. D. California. Feb. 17, 1863.

MEXICAN LAND GRANTS—PAROL EVIDENCE—ACT OF POSSESSION.

[The record of the act of possession based on depositions containing statements upon which the alcalde acted cannot be contradicted by parol evidence of aged, illiterate, and infirm witnesses as to their recollection of what was done or intended by the alcalde.]

Settlement of the boundary between the Buri Buri and the Visitacion ranchos, in the neighborhood of San Francisco. [See Case No. 16,017.]

OPINION OF THE COURT. The official surveys of these ranchos are objected to by the owners of the former. The principal controversy relates to the location of the northern line of the Buri Buri, or Sanchez grant, which is also the southern boundary of the Visitacion Rancho, confirmed to Henry R. Payson et al. The grant to Jose De La Cruz Sanchez was issued on the 23d September, 1835. The only boundaries it mentions are "San Mateo and the Corral de San Bruno." The fourth condition describes the land as of the extent of four square leagues, as shown by the map. In the resolution of approval by the departmental assembly, the boundaries are mentioned with more particularity: "The tract conceded will include the lands now occupied, bounded by the Mission of San Francisco on the north, with the rancho of San Mateo on the south, with the esteros of the bay on the east, and with the rancho of La Costa on the east, which dimensions will be observed at the time of giving possession." The rancho of Cañada de Guadalupe Visitacion y Rodeo Viejo, granted to Jacob P. Leese, is described as bounded "on the east by the bay, on the west by the Camino Real and Portezuelo, on the north by the rancho of Don Cornelio Bernal, and on the south by that of Don Jose Sanchez." In order, therefore, to establish the southern boundary of the Visitacion Rancho, the northern boundary of the Buri Buri must be ascertained. The description in the decree in the Buri Buri case is taken from the record of the judicial possession of the rancho, given in 1835 to the grantee; and this record is referred to in the decree for a more particular description of the boundary. The record contains, as is usual: (1) The depositions of the witnesses who testify to the recognized boundaries of the rancho. (2) The account of the preliminary reconnoissance, or "vista de ojos," where the witnesses point out to the alcalde, on the ground, the boundaries and landmarks, previously described in their depositions. And (3) the record of the actual measurement and estab-

lishing of the boundaries, and the formal giving of the possession by the alcalde. The witnesses examined by the alcalde were Bartolo Bojorques. Jose Antonio Alviso, and Antonio Soto. They all describe the northeastern corner and the northern boundary line in the same terms. The eastern and the northern boundaries are the last mentioned, and they are described as follows: "Thence, following a direction to the north along the margin of the esteros of the bay of the port as far as the rincon called San Bruno, at the foot of that hill, and, from east to west, along the foot of that hill, 'cerro,' as far as a very short cañada," etc. Soto describes the line as running north, along the margin of the esteros "as far as the foot of the hill of San Bruno and rincon of the same name, and, from east to west, following the foot of said hill," etc., thus reversing the order in which the foot of the cerro and the rincon are mentioned by the other witnesses, but obviously intending, like them, to indicate a rincon at the south base of the hill of San Bruno.

In the account of the preliminary reconnoissance the alcalde describes the boundary pointed out to him by the witnesses as follows: "I ordered the aforesaid individuals to show me the places, limits, and boundaries, according to the indications they have made in their depositions and in conformity with them. They guided me toward the north as far as the foot of the hill ('cerro') named San Bruno, where enters an estero which looks towards the south, and, standing at that place and the point of said estero, which they told me was called the 'Rincon de San Bruno'; from thence beginning the examination with direction towards the west, following the foot of said hill, they showed me a small cañada," etc. After making this reconnoissance, swearing the measurers, measuring the cordel, &c., the alcalde proceeds to the formal measurement of the land and establishment of its boundaries. In his record of the proceeding, the measurement of the boundary in question, is described by the alcalde as follows: "They began said measurement from the 'Solar,' which looks towards the north, and is situated at the foot of the San Bruno hill, the rincon of that name, and the end of an estero which is there and looks towards the south; from said point directing their course towards the west, following the skirt (falda) of said hill," etc. From these descriptions it is very plain that no part of the hill of the San Bruno was included within the limits of the Buri Buri Rancho.

The depositions of the witnesses, the account of the preliminary reconnoissance, and the record of the formal measurement, clearly indicate that in following the eastern boundary in a northerly direction along the esteros they stopped on reaching the rincon or corner at the foot of the hill of San Bruno, and that the northern boundary ran

from that point in a westerly direction along the base of the same ridge of hills. The indications of the diseño of the Visitacion grant are equally explicit. It is drawn by Vioget, a professional surveyor, and with more than usual care. The southern boundary of the Visitacion Rancho is indicated by a dotted line, which commences at the bay to the south of the hill or cerro of San Bruno, and running along the southern base of the range of hills of that name, terminates at the Camino Real. It cannot be doubted that it was intended to include within the limits of this map the hills of San Bruno, and that the boundary between the two ranchos was meant to be drawn at their base. The official survey, following literally the erroneous translation of the word "rincon," contained in the decree, has adopted as the point of beginning the "Punta de San Bruno," or the most easterly extremity of the hills of that name, where, projecting into the bay, they form a point or promontory. From thence the line has been surveyed in a westerly direction, running along the hills at a considerable elevation above their base, and in several instances following the line of their crest. But this survey is obviously inconsistent with the terms of the decree as well as with the very explicit language of the act of possession to which the decree refers, and which it was meant to adopt. The language of the decree is, "Beginning at the base of the hill of San Bruno at the point (rincon) of the same name, and the extremity of an estuary which is there and looks to the south, and running thence in a westerly direction along the side of said hill," etc. Read by the light of the act of possession, it is plain that the point of commencement herein referred to was the extremity of an estuary in a rincon or corner of land, lying at the southerly base of the San Bruno hill, and that the line was to be run thence along the base of the hills towards the Camino Real. The term "falda," which occurs in the record of measurement, is translated "side" in the decree. But in the depositions of the witnesses, and in the account of the preliminary reconnoissance, the word "pie," or "foot," is alone mentioned, and the term "falda," which means the lower slope of a hill, was undoubtedly used by the alcalde in the same sense. It is perhaps not easy precisely to define the limits of the tract described as the rincon of San Bruno; nor is it necessary. It was evidently a piece of land lying at the southern base of the hill of San Bruno, within which was an "estero" at the point or head of which the survey commenced. This estero is a natural object readily identified. It is pointed out by Galindo, one of the measurers who assisted at the act of possession. It is the only estero in the immediate vicinity, and its punta or extremity is immediately adjacent to the base of the cerro, and lies within the limits of the rincon. It is evidently the

point of commencement established by the alcalde, and described in the decree. From this point it is plain that the line should run in a general westerly direction along the base of the hills so as to leave the latter on the north and within the limits of the Visitacion Rancho. An effort has been made to prove by the testimony of Bajorques and Alviso that the point of commencement fixed by the alcalde was a shell mound or site of an Indian rancheria, north of the estero but south of San Bruno point, adopted in the official survey as the point of beginning. But to this suggestion it is enough to say that it is inconsistent with the act of possession and with the language of the decree. Nothing can be clearer than that the point of commencement established by the act of possession and referred to in the decree was the extremity of an estero situated in a rincon at the base of the San Bruno hill. It is also sought by the testimony of the same witnesses to show that though the line was in fact run along the base of the hills, it was intended to follow their crest.

It is unnecessary to allude to the admissibility of parol testimony to vary the positive terms of a formal record of a judicial proceeding. The record itself discloses that the statement of the witnesses cannot be true. Their own depositions on which the alcalde acted, fix in the most explicit manner the northern line of the Buri Buri at the "pie" (foot) of the hills, and the alcalde certifies that they pointed out that line to him, and it was measured in their presence along the "falda." As against a formal record of this kind, the evidence of aged, illiterate and very infirm witnesses as to their recollection of what was done or intended by the alcalde is, even if admissible, entitled to no weight whatever.

It is also objected, on the part of the United States, that the northern line of the surveys is incorrect in not running in a straight line from the extremity of the estero to the "Laguna Alta." The effect of the alteration suggested would be to exclude from the Buri Buri a strip of land of a triangular shape, which it is contended would constitute a "sobrante" not included within either rancho. But it is evident from the terms of the act of possession that the line from the estero could not have been a straight line, for it is described as following the "falda" of the hills, and it was drawn to a small valley, which begins at the public road, and ends between the Laguna San Bruno and a wooden corral, also called the "Corral de San Bruno." These objects, the Laguna de San Bruno and the corral of the same name, are clearly identified, and I do not understand their position to be disputed.

All the witnesses before the alcalde mention the "Corral de San Bruno," which is at the margin and south of the laguna of the same name, situated in a small valley, or cañada, as the first boundary, or landmark,

of the rancho, and they state that the line runs "from said place of the Corral de San Bruno in a westerly direction to the Laguna Alta." The principal ground for contending that the line should run directly from the estero to the Laguna Alta is the fact that the record, after describing it as following the falda of the hills to a small cañada between the Laguna and the Corral de San Bruno, states that it was continued "in the same direction" to the Laguna Alta. But it is not said that the line was a straight line, and we have seen that all the witnesses describe the line from the Corral de San Bruno to the Laguna Alta as running in a westerly direction. In point of fact its course will be considerably to the south of west; but it is highly probable that the alcalde, whose notions of courses by compass were probably as vague as those of the witnesses, assumed, as they did, that the line from the corral would run in a westerly direction, which would be in the same general course as that portion of it from the estero to the corral. But this slight discrepancy is clearly of too little importance to justify us in rejecting the explicit call for the little valley between the Corral de San Bruno and the laguna of the same name, contained in the act of possession, and adopted in the final decree of confirmation. The diseño is also appealed to to show that the line should run directly to the Laguna Alta; but it is evident that both the Laguna Alta and that of San Bruno are very inaccurately laid down on the map, the distance between them being much less than the actual distance. The dotted lines on the diseño seem to have been intended by the alcalde to indicate rather the breadth and length of the tract than its boundaries; for the easternmost line is drawn at some distance from and parallel to the shore of the bay, and yet it is not and cannot be denied that the bay was the eastern boundary. The northern line is drawn at right angles to the eastern line from the estero to the Laguna Alta, but passing near to the Laguna San Bruno at what was no doubt supposed to be the cañada, between the corral and the Laguna San Bruno.

The error already noticed, viz. the supposition that the line from the corral, or the little valley between it and the Laguna San Bruno to the Laguna Alta, would be in the same direction as the line from the estero to the corral, is reproduced on the diseño, and the line is represented as passing by the Laguna San Bruno, and continuing in the same course to the Alta. The whole delineation is very rude, and obviously inaccurate. It was no doubt made by the alcalde to indicate, roughly, the more important landmarks established by him when giving the possession; but it is of no weight when opposed to the explicit and unmistakable description of the lines actually run and the landmarks established, contained in

the formal record of his proceedings. The objection last noticed is made by the United States. But it may well be doubted whether, if sustained, the effect would not be to give the strip of land in question to the owners of the Visitacion Rancho and not to the United States. That rancho is bounded on the south by the rancho of Sanchez. It was granted subject to the boundaries of the latter, with which it was intended to be colindante. These boundaries, therefore, when finally established by competent authority, would seem to determine the boundaries of the neighboring rancho, especially as it is shown that there is not enough land within the exterior limits of both ranchos to satisfy the calls for quantity. But the owners of the Visitacion Rancho make no objection to the northwestern corner as fixed in the official survey, and for the reason above given I am of opinion that the location is substantially correct. My opinion is that the official survey should be modified by drawing the northern line of the Buri Buri Rancho from the extremity of the estero, commencing at the stake pointed out by the witnesses, and adopted in the survey of that line by Milo Hoadley; thence following the base of the hills, as indicated in the diagram, marked "Exhibit No. 2," attached to the deposition of that witness, but changing the last course so that it shall terminate at the station marked "B. B., No. 2," on said diagram, and also on the official survey.